**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| QUANTEFI CORP.<br><br>*Plaintiff,*<br><br>vs.<br><br>COMMSCOPE HOLDING COMPANY, INC., COMMSCOPE INC., VISTANCE NETWORKS HOLDINGS, LLC; VISTANCE NETWORKS INC.<br><br>*Defendant.* | Case No. 2:26-cv-00735<br><br>**Complaint for Patent Infringement**<br><br>**JURY DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff QuanteFi Corporation ("QuanteFi") files this complaint against Defendants Commscope Holding Company, Inc., Commscope Inc., Vistance Networks, Inc., Vistance Networks Holdings, LLC ("Defendants"), alleging infringement of U.S. Patent Nos. 7,656,900 (the "'900 Patent"), 9,331,883 (the "'883 Patent"), 11,258,500 (the "'500 Patent"), 10,321,341 (the "'341 Patent") (collectively, the "Asserted Patents").

## BACKGROUND

1. This complaint arises from Defendants' infringement of the following United States patents owned by QuanteFi, each of which relates to wireless communications technology and standardized wireless functionality: U.S. Patent No. 7,656,900 ("'900 Patent"), U.S. Patent No. 9,331,883 ("'883 Patent"), U.S. Patent No. 11,258,500 ("'500 Patent"), and U.S. Patent No. 10,321,341 (the "'341 Patent").

2. On information and belief, from approximately April 2019 until approximately July 1, 2026 Defendant owned Ruckus Networks ("Ruckus") and sold, offered for sale, manufactured

and/or imported a variety of wireless communication devices, including enterprise-grade networking equipment such as high-performance indoor and outdoor wireless access points ("AP"s) "designed to handle high-density environments and challenging outdoor locations." https://www.ruckusnetworks.com/products/.

3. Defendant Vistance Networks completed its sale of Ruckus to Belden Inc. for approximately $1.85 billion on July 1, 2026, and on information and belief, retained responsibility for some or all of the past and future liabilities of Ruckus, including liabilities for patent infringement. Further, on information and belief, Defendants retained the ability to continue at least using the Ruckus-branded products after the sale to Belden, Inc.

4. The infringement allegations in this Complaint are based on implementations of wireless technologies, including those governed by IEEE 802.11 standards. These wireless technologies include, for example, dynamic bandwidth operation, preamble puncturing, Wi-Fi multi-user MIMO operation, Wi-Fi sounding and beamforming, and channel tracking.

**PLAINTIFF QUANTEFI AND THE ASSERTED PATENTS**

5. Plaintiff QuanteFi Corporation is a corporation organized under the laws of Delaware, with its principal place of business at 603 East Milwaukee Street, Suite 200, Detroit, MI 48202.

6. QuanteFi is the owner of U.S. Patent No. 7,656,900, titled "Methods and Systems for Adaptive Communication," which issued on February 2, 2010. A copy of the '900 Patent is attached to this Complaint as Exhibit 1.

7. QuanteFi is the owner of U.S. Patent No. 9,331,883, titled "Wireless Home Network Supporting Concurrent Links to Legacy Devices," which issued on May 3, 2016. A copy of the '883 Patent is attached to this Complaint as Exhibit 2.

8. QuanteFi is the owner of U.S. Patent No. 11,258,500, titled "Hybrid Sector Selection and Beamforming," which issued on February 22, 2022. A copy of the '500 Patent is attached to this Complaint as Exhibit 3.

9. QuanteFi is the owner of U.S. Patent No. 10,321,341, titled "Channel Tracking in a Wireless Home Network," which issued on June 11, 2019. A copy of the '341 Patent is attached to this Complaint as Exhibit 4.

**DEFENDANTS AND THE ACCUSED INSTRUMENTALITIES**

10. Defendant CommScope Holding Company, Inc. was a corporation organized under the laws of the State of Delaware, with its principal place of business at 1100 CommScope Place, SE, Hickory, North Carolina 28602. Upon information and belief, Commscope Holding was rebranded to Vistance Networks Holdings, LLC.

11. Defendant CommScope, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1100 CommScope Place, SE, Hickory, North Carolina 28602. On information and belief, CommScope, Inc. is a wholly owned subsidiary of CommScope Holding Company. Commscope, Inc. was rebranded to Vistance Networks, Inc.

12. Defendant Vistance Networks Holdings, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2601 Telecom Parkway, Richardson, TX 75082. It has as its registered agent for service: 1521 Concord Pike Suite 201, Wilmington, DE, 19803.

13. Defendant Vistance Networks, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2601 Telecom Parkway, Richardson, TX 75082. https://www.linkedin.com/company/vistance-networks. It has as its registered agent for service: 1521 Concord Pike Suite 201, Wilmington, DE, 19803. On information and belief,

Vistance Networks Holdings is a wholly owned subsidiary of Vistance Networks, Inc. Upon information and belief, Vistance Networks Holdings and Vistance Networks, Inc. are a single combined “Vistance Networks” company. For example, both companies use the same registered agent. The websites of both companies are also combined into a single “Vistances Networks” presence.

14. On information and belief, Defendants owned Ruckus Networks until July 1, 2026. CommScope acquired Ruckus in 2019. https://www.crn.com/news/networking/commscope-completes-once-in-a-lifetime-arris-ruckus-acquisition. In Janurary 2026, CommScope was rebranded to Vistance Networks. https://www.vistancenetworks.com/. On July 1, 2026, Vistance Networks sold its Ruckus-branded products to Belden Inc. https://www.vistancenetworks.com/press-releases/2026/vistance-networks-to-sell-its-ruckus-networks-business-to-belden-inc.-for-$1.846-billion.

15. The Accused Instrumentalities include, without limitation: Defendants’ indoor and outdoor access points under the Ruckus brand (e.g., its R series, T series, and H series products), and other Ruckus wireless networking products and services that implement the accused functionalities between 2018 and June 30, 2026, including, e.g., the IEEE 802.11ac, ax, be, and higher technical standards, also known as the “WiFi-5” “WiFi-6” and “WiFi-7” standards respectively, and the functionalities described below.

## JURISDICTION AND VENUE

16. This action arises under the patent laws of the United States, Title 35 of the United States Code.

17. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18. Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b).

19. This Court has personal jurisdiction over Defendants in this action because Defendants have committed acts within this District giving rise to this action, and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and through subsidiaries or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, importing, offering to sell, and selling products that infringe the asserted patents, and inducing others to infringe the asserted patents in this District. Defendants are directly and through intermediaries making, using, selling, offering for sale, distributing, advertising, promoting, and otherwise commercializing the infringing products in this District. Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from goods and services provided to the residents of this District and the State of Texas.

20. Venue is proper in this federal district pursuant to 28 U.S.C. § 1400(b) because during relevant infringement period, Defendants have committed acts of infringement in this District including using and purposefully transacting business involving the infringing products in this District such as by sales to one or more customers in the State of Texas including in this District, for example by selling and offering for sale the Accused Instrumentalities to customers in this District directly, as well as through resellers and distributors. Further, Defendants maintain regular and established places of business in this District, including e.g., at 2601 Telecom Parkway, Richardson, Texas 75082.

21. Upon information and belief, Defendants have numerous agents or employees that reside in this District, regularly work in this District, and conduct business in this District.

Furthermore, Defendants maintain and/or maintained such regular and established place(s) of business in this District and has previously not contested that venue in this District was proper.

**COUNT 1 – INFRINGEMENT OF THE '900 PATENT**

22. QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

23. On February 2, 2010, the U.S. Patent and Trademark Office issued U.S. Patent No. 7,656,900 titled "Methods and Systems for Adaptive Communication." Ex. 1.

24. QuanteFi is the owner of the '900 Patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

25. The'900 Patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

26. QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '900 Patent, and there are no unmarked articles subject to a duty to mark. QuanteFi is entitled to damages for Defendant's past infringement.

27. On information and belief, Defendants make, use, import, offer for sale, and sell certain infringing products in the United States, including the Accused Instrumentalities. The infringing products implement technologies such as dynamic bandwidth operation (in Wi-Fi 5, 6, and 7) as well as preamble puncturing in (Wi-Fi 6 and 7), that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the '900 Patent.

28. The Accused Instrumentalities satisfy all claim limitations of one or more claims of the '900 Patent. On information and belief, the Accused Instrumentalities employ, implement,

or utilize materially the same technologies, such that facts material to infringement by one Accused Instrumentality will be material to others. For example, the Accused Instrumentalities all implement the IEEE 802.11 wireless standards.

29. With respect to 1[pre], the Accused Instrumentalities include "a point-to-multipoint communication system". For example, the Accused products implement IEEE 802.11 standards, where an access point (AP) is associated with multiple stations (STAs). *See, e.g.*, IEEE 802.11-2020, p. 265, § 4.5.3.3 ("An AP might be associated with many STAs at the same time."); IEEE 802.11be-2024, p. 69, § 4.5.3.3 ("An AP might be associated with many non-AP STAs at the same time. Similarly, an AP MLD might be associated with many non-AP MLDs at the same time.");

> The VHT PHY is based on the HT PHY defined in Clause 20, which in turn is based on the OFDM PHY defined in Clause 18. The VHT PHY extends the maximum number of space-time streams supported to eight and provides support for downlink multi-user (MU) transmissions. A downlink MU transmission supports up to four users with up to four space-time streams per user with the total number of space-time streams not exceeding eight.
>
> NOTE—A VHT SU PPDU includes individually addressed and group addressed transmissions.
>
> The VHT PHY provides support for 20 MHz, 40 MHz, 80 MHz, and 160 MHz contiguous channel widths and support for 80+80 MHz noncontiguous channel width.
>
> The VHT PHY data subcarriers are modulated using binary phase shift keying (BPSK), quadrature phase shift keying (QPSK), 16-quadrature amplitude modulation (16-QAM), 64-QAM, and 256-QAM. Forward error correction (FEC) coding (convolutional or LDPC coding) is used with coding rates of 1/2, 2/3, 3/4, and 5/6.

IEEE 802.11ac-2013, p. 214, § 22.1.1.

30. With respect to claim 1[a], the Accused Instrumentalities include "a first network node configured to be coupled to a multicarrier communication channel including a plurality of subcarriers," "wherein the first network node is configured to dynamically alter bandwidth at which data is transferred," and do so "to account for a change in a characteristic of the communication channel."

31. For example, as shown below, the Accused Instrumentalities support multiple data subcarriers.

> The VHT PHY is based on the HT PHY defined in Clause 20, which in turn is based on the OFDM PHY defined in Clause 18. The VHT PHY extends the maximum number of space-time streams supported to eight and provides support for downlink multi-user (MU) transmissions. A downlink MU transmission supports up to four users with up to four space-time streams per user with the total number of space-time streams not exceeding eight.
>
> NOTE—A VHT SU PPDU includes individually addressed and group addressed transmissions.
>
> The VHT PHY provides support for 20 MHz, 40 MHz, 80 MHz, and 160 MHz contiguous channel widths and support for 80+80 MHz noncontiguous channel width.
>
> The VHT PHY data subcarriers are modulated using binary phase shift keying (BPSK), quadrature phase shift keying (QPSK), 16-quadrature amplitude modulation (16-QAM), 64-QAM, and 256-QAM. Forward error correction (FEC) coding (convolutional or LDPC coding) is used with coding rates of 1/2, 2/3, 3/4, and 5/6.

IEEE 802.11ac-2013, p. 214, § 22.1.1.

> The EHT PHY provides support for DL OFDMA, UL OFDMA, DL MU-MIMO, and UL MU-MIMO. Both DL MU-MIMO and UL MU-MIMO transmissions are supported on both the entire PPDU bandwidth and portions of the PPDU bandwidth, with the assigned resource unit of size greater than or equal to 242 tones. On a resource unit utilizing MU-MIMO transmission, there is support for up to 8 users with up to 4 spatial streams per user with the total number of spatial streams across all users not exceeding 8. The EHT PHY also supports preamble puncturing of an EHT MU PPDU for both OFDMA and non-OFDMA.
>
> The EHT PHY defines RUs comprising of 26, 52, 106, 242, 484, 996, 2×996 or 4×996 tones in 36.3.2.1, and MRUs comprising two or more RUs in certain combinations in 36.3.2.2. The EHT PHY provides support of an MRU assigned to a single STA.
>
> The EHT PHY provides support for 0.8 µs, 1.6 µs, and 3.2 µs guard interval durations.
>
> The EHT PHY provides support for 3.2 µs (1×), 6.4 µs (2×), and 12.8 µs (4×) EHT-LTF symbol durations, excluding the GI duration.
>
> The EHT PHY supports a symbol duration, excluding GI, a DFT period of 3.2 µs for the pre-EHT modulated fields and 12.8 µs for the Data field in an EHT PPDU.
>
> The EHT PHY data subcarrier frequency spacing is the same as the HE PHY data subcarrier frequency spacing, which is a quarter of the VHT PHY and HT PHY data subcarrier frequency spacing.

IEEE 802.11be-2024, p. 658, § 36.1.1.

32. The Accused Instrumentalities have dynamic bandwidth operations.

> **dynamic bandwidth operation:** A feature of a very high throughput (VHT) station (STA) in which the request-to-send/clear-to-send (RTS/CTS) exchange, using non-high-throughput (non-HT) duplicate physical layer (PHY) protocol data units (PPDUs), negotiates a potentially reduced channel width (compared to the channel width indicated by the RTS) for subsequent transmissions within the current transmission opportunity (TXOP).

IEEE 802.11ac-2013, p. 6, § 3.2.

> A VHT STA that is addressed by an RTS frame in a non-HT or non-HT duplicate PPDU that has a bandwidth signaling TA and that has the RXVECTOR parameter DYN_BANDWIDTH_IN_NON_HT equal to Dynamic behaves as follows:
>
> — If the NAV indicates idle, then the STA shall respond with a CTS frame in a non-HT or non-HT duplicate PPDU after a SIFS period. The CTS frame's TXVECTOR parameters CH_BANDWIDTH and CH_BANDWIDTH_IN_NON_HT may be set to any channel width for which CCA on all secondary channels has been idle for a PIFS prior to the start of the RTS frame and that is equal to or less than the channel width indicated in the RTS frame's RXVECTOR parameter CH_BANDWIDTH_IN_NON_HT.
>
> — Otherwise, the STA shall not respond with a CTS frame.

IEEE 802.11ac-2013, p. 122, § 9.3.2.6.

Figure 3. RTS/CTS enhanced with bandwidth signaling




https://connectedtech.org/wp-content/uploads/2014/01/Cisco-802-11ac-white_paper_c11-713103.pdf at p. 11.

33. The Accused Instrumentalities have preamble puncturing, which allows a device to selectively carve out a portion of a channel to account for change in characteristics of the channel. *See, e.g.*, https://www.cisco.com/c/en/us/products/collateral/networking/wireless/wifi7-future-of-wireless-dg.html ("Wi-Fi 7 introduces "preamble puncturing," which allows a device to selectively ignore a problematic portion of a channel—effectively removing it from use without impacting the rest of the transmission.").

34. With respect to claim 1[b], the Accused Instrumentalities include a first network node "configured to transfer data during a first time interval over a first set of initial frequencies that are selected from the plurality of subcarriers to provide a first bandwidth," and "to transfer data during a second time interval over a first set of modified frequencies that are selected from the plurality of subcarriers to provide a second bandwidth."

35. For example, the Accused Instrumentalities have dynamic bandwidth operations as shown below.

**10.23 HCF**

**10.23.1 General**

Under HCF, the basic unit of allocation of the right to transmit onto the WM is the TXOP. Each TXOP is defined by a starting time and a defined maximum length. In a non-DMG BSS, the TXOP may be obtained by a STA winning an instance of EDCA contention (see 10.23.2) or by a STA receiving a QoS (+)CF-Poll frame (see 10.23.3). The former is called *EDCA TXOP*, while the latter is called *HCCA TXOP* or *polled TXOP*.

IEEE 802.11-2020, p. 1736, § 10.23.1.




https://connectedtech.org/wp-content/uploads/2014/01/Cisco-802-11ac-white_paper_c11-713103.pdf at p. 11.

36. As another example, the Accused Instrumentalities have preamble puncturing as shown below.

> Figure 5-5 illustrates three example scenarios of an 80 MHz PPDU transmission (AP-A). First, the full 80 MHz can be used for transmission because the other AP is inactive. Second, if the AP-B becomes active on the second 20 MHz channel, AP-A can only use the primary 20 MHz of the 80 MHz channel. In the third case, AP-A detects the second 20 MHz subchannel is busy. The AP signals to the STA that it is puncturing the second subchannel and will transmit on the first, third and fourth subchannels, allowing it to fully utilize the available spectrum (60 MHz).

https://8928696.fs1.hubspotusercontent-na1.net/hubfs/8928696/20240507%20-%20Rohde%20&%20Schwarz%20IEEE%20802-11be%20Whitepaper.pdf at p. 14.

37. The Accused Instrumentalities further satisfy the requirement that "the first set of initial frequencies differ[] from the first set of modified frequencies such that the first and second bandwidths account for the change in the characteristic of the communication channel."

38. For example, the Accused Instrumentalities have dynamic bandwidth operations as shown below.

**Figure 3.** RTS/CTS Enhanced with Bandwidth Signalling




https://connectedtech.org/wp-content/uploads/2014/01/Cisco-802-11ac-white_paper_c11-713103.pdf at p. 11.

39. As another example, the Accused Instrumentalities have preamble puncturing as shown below.

Figure 5-5 illustrates three example scenarios of an 80 MHz PPDU transmission (AP-A). First, the full 80 MHz can be used for transmission because the other AP is inactive. Second, if the AP-B becomes active on the second 20 MHz channel, AP-A can only use the primary 20 MHz of the 80 MHz channel. In the third case, AP-A detects the second 20 MHz subchannel is busy. The AP signals to the STA that it is puncturing the second subchannel and will transmit on the first, third and fourth subchannels, allowing it to fully utilize the available spectrum (60 MHz).

**Figure 5-5: Example of an 80 MHz PPDU transmission (AP-A) in three different scenarios**




A finite number of puncturing patterns are defined to reduce signaling and implementation complexity. For OFDMA, the patterns X212, 1X12, 12X2, 121X, XX12, 12XX and 1XX2 are defined per 80 MHz subblock. Each pattern value represents a 20 MHz subchannel, "X" stands for a punctured subchannel and 1, 2 are the content channel numbers (which is similar to the IEEE 802.11ax content channel). Note that if two subchannels are punctured, they must be adjacent.

https://8928696.fs1.hubspotusercontent-na1.net/hubfs/8928696/20240507%20-%20Rohde%20&%20Schwarz%20IEEE%20802-11be%20Whitepaper.pdf at pp. 14-15.

40. Defendants have knowingly and intentionally induced and contributed to infringement of the ’900 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the ’900 Patent and the infringing nature of the Accused Instrumentalities at least because of their active and ongoing historical (a) monitoring of industry standards, (b) involvement in creating, shaping and voting for industry standards including IEEE 802.11 WiFi standards, (c) leading role in certifying products as compliant with such standards, (d) on information and belief, activities including monitoring of patents relevant to such standards and such products compliant with such standards in support of both its own patent portfolio and the various indemnifications against patent infringement it offers its

customers, (e) through the standard diligence process related to the Ruckus sale as the ’900 Patent is also asserted against other products in the industry implementing the same standard, and (f) through at least the filing and service of this Complaint.

41. Despite this knowledge, Defendants have continued to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the ’900 Patent. Defendants have done so knowing and intending that their customers will commit these infringing acts. Defendants have also continued to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the ’900 Patent, thereby specifically intending for and inducing their successors and customers to infringe the ’900 Patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education and instructions to customers; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

42. Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the ’900 Patent.

43. Defendants have induced, and continued to induce, infringement of the ’900 Patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as

technical information on how to make or configure the Accused Instrumentalities; providing information, education and instructions on the use of the Accused Instrumentalities; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

44. QuanteFi has been damaged by Defendants' infringement of the '900 Patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 2 – INFRINGEMENT OF THE '500 PATENT

45. QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

46. On February 22, 2022, the United States Patent and Trademark Office issued U.S. Patent No. 11,258,500, titled "Hybrid Sector Selection and Beamforming." Ex. 2.

47. QuanteFi is the owner of the '500 Patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

48. The '500 Patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

49. QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '500 Patent in that QuanteFi is unaware of an articles subject to a duty to mark, and QuanteFi is entitled to damages for Defendants' past infringement and QuanteFi is entitled to damages for Defendants' past infringement.

50. On information and belief, Defendants make, use, import, offer for sale, and sell certain infringing products in the United States. The Accused Instrumentalities are, for example, Wi-Fi 6 and later wireless access points, and/or other wireless networking products and services that support HE sounding with OFDMA Resource Unit ("RU") technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the '500 Patent.

51. The Accused Products satisfy all claim limitations of one or more claims of the '500 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same HE sounding with OFDMA RU technology, such that facts material to infringement by one Accused Instrumentality will be material to others.

52. With respect to claim 1[a], the Accused Instrumentalities perform "configuring a pattern of a sounding packet of a first wireless node in a resource space," including "assigning a first plurality of precoders to a first subset of the resource space for a first antenna sector of the first wireless node," and "assigning a second plurality of precoders to a second subset of the resource space for the second antenna sector of the first wireless node":

## 26.7 HE sounding operation

### 26.7.1 General

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.




**Figure 26-7—Example of HE non-TB sounding**




**Figure 26-8—Example of HE TB sounding**

### 27.3.16 SU-MIMO and DL MU-MIMO beamforming

#### 27.3.16.1 General

SU-MIMO and DL MU-MIMO beamforming are techniques used by a STA with multiple antennas (the beamformer) to steer signals using knowledge of the channel to improve throughput. With SU-MIMO




**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**

| | Frame Control | Duration | RA | TA | Sounding Dialog Token | STA Info List | FCS |
|---|---|---|---|---|---|---|---|
| Octets: | 2 | 2 | 6 | 6 | 1 | *n* × 4 | 4 |

**Figure 9-79—HE NDP Announcement frame format**

| | B0 B10 | B11 B24 | B25 B26 | B27 | B28 | B29 B31 |
|---|---|---|---|---|---|---|
| | AID11 | Partial BW Info | Feedback Type And Ng | Disambiguation | Codebook Size | Nc |
| Bits: | 11 | 14 | 2 | 1 | 1 | 3 |

**Figure 9-80—STA Info field format in an HE NDP Announcement frame if the AID11 subfield is not 2047**

| | B0 B6 | B7 B13 |
|---|---|---|
| | RU Start Index | RU End Index |
| Bits: | 7 | 7 |

**Figure 9-81—Partial BW Info subfield format**

The RU Start Index subfield in the Partial BW Info subfield indicates the first 26-tone RU for which the HE beamformer is requesting feedback. The RU End Index subfield of the Partial BW Info subfield indicates the last 26-tone RU for which the HE beamformer is requesting feedback. The value of the RU Start Index subfield is less than or equal to the value of the RU End Index subfield. The RU Start Index subfield and RU

### Table 26-4—Settings for BW, RU Start Index, and RU End Index fields in HE NDP Announcement frame

| Partial bandwidth supported by HE beamformer | Operating channel width of the HE beamformee (MHz) | Bandwidth of HE NDP Announcement frame | RU Start Index field | RU End Index field |
|---|---|---|---|---|
| No | 20, 40, 80, 160/80+80 | 20 MHz | 0 | 8 |
| Yes | 20, 40, 80, 160/80+80 | | 0–8 | 0–8 |
| No | 40, 80, 160/80+80 | 40 MHz | 0 | 17 |
| Yes | 40, 80, 160/80+80 | | 0–17 | 0–17 |
| No | 80, 160/80+80 | 80 MHz | 0 | 36 |
| Yes | 80, 160/80+80 | | 0–36 | 0–36 |
| No | 160/80+80 | 160 MHz or 80+80 MHz | 0 | 73 |
| Yes | 160/80+80 | | 0–73 | 0–73 |

NOTE 1—The value of the RU Start Index field is always less than or equal to the value of the RU End Index field.

NOTE 2—Partial BW feedback can be solicited only with an HE TB sounding sequence and cannot be solicited with an HE non-TB sounding sequence.

### 27.3.17 HE sounding NDP

The HE sounding NDP is a variant of the HE SU PPDU. The format of an HE sounding NDP is defined in Figure 27-46.




**Figure 27-46—HE sounding NDP format**

### 27.3.11.10 HE-LTF field

The HE-LTF field provides a means for the receiver to estimate the MIMO channel between the set of constellation mapper outputs (or, if STBC is applied, the STBC encoder outputs) and the receive chains. In an HE SU PPDU and HE ER SU PPDU, the transmitter provides training for $N_{STS}$ space-time streams (spatial mapper inputs) used for the transmission of the PSDU. In an HE MU PPDU, the transmitter provides training for $N_{STS,r,total}$ space-time streams used for the transmission of the PSDU(s) in the $r^{th}$ RU. In an HE TB PPDU, the transmitter of user $u$ in the $r^{th}$ RU provides training for $N_{STS,r,u}$ space-time streams used for the transmission of the PSDU. For each subcarrier in the $r^{th}$ RU, the MIMO channel that can be estimated is an $N_{RX} \times N_{STS,r,total}$ matrix. An HE transmission has a preamble that contains HE-LTF symbols, where the data tones of each HE-LTF symbol are multiplied by entries belonging to a matrix $P_{\text{HE-LTF}}$, to enable channel estimation at the receiver. When single stream pilot is used in HE-LTF, the pilot subcarriers of each

### 27.3.6.9 Construction of HE-LTF field

The HE-LTF field is defined in 27.3.11.10 and is constructed as follows:

a) Sequence generation: Generate the HE-LTF sequence in frequency domain over the bandwidth indicated by CH_BANDWIDTH as described in 27.3.11.10. Apply a 3 dB power boost if transmitting an HE ER SU PPDU as described in 27.3.11.10.

b) $A_{\text{HE-LTF}}$ matrix mapping: Apply the $P_{\text{HE-LTF}}$ matrix to the data tones of the HE-LTF sequence, and apply the $R_{\text{HE-LTF}}$ matrix to pilot subcarriers of the HE-LTF sequence, except the UL MU-MIMO transmission not using HE single stream pilot HE-LTF mode as described in 27.3.11.10. There is no pilot mapping for an HE TB feedback NDP.

c) CSD: Apply CSD for each space-time stream and frequency segment as described in 27.3.11.2.2.

d) Spatial mapping: Apply the $Q$ matrix as described in 27.3.11.10.

e) IDFT: Compute the inverse discrete Fourier transform.

f) GI and windowing: Prepend a GI indicated by the TXVECTOR parameter GI_TYPE, and apply windowing as described in 27.3.10.

g) Analog and RF: Upconvert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 27.3.10 and 27.3.11 for details.




**Figure 27-35—Generation of 2x HE-LTF symbols per frequency segment**

IEEE 802.11-2024; Figures 26-7, 26-8, 27-17, 9-79, 9-80, 9-81, 27-46, 27-35; Table 26-4.

53. With respect to claim 1[b], the Accused Instrumentalities "wirelessly transmit[] the sounding packet with the configured pattern to a second wireless node":

## 26.7 HE sounding operation

### 26.7.1 General

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.




**Figure 26-7—Example of HE non-TB sounding**




**Figure 26-8—Example of HE TB sounding**




**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**

| | Frame Control | Duration | RA | TA | Sounding Dialog Token | STA Info List | FCS |
|---|---|---|---|---|---|---|---|
| Octets: | 2 | 2 | 6 | 6 | 1 | $n \times 4$ | 4 |

**Figure 9-79—HE NDP Announcement frame format**

| | B0 B10 | B11 B24 | B25 B26 | B27 | B28 | B29 B31 |
|---|---|---|---|---|---|---|
| | AID11 | Partial BW Info | Feedback Type And Ng | Disambiguation | Codebook Size | Nc |
| Bits: | 11 | 14 | 2 | 1 | 1 | 3 |

**Figure 9-80—STA Info field format in an HE NDP Announcement frame if the AID11 subfield is not 2047**

| | B0 B6 | B7 B13 |
|---|---|---|
| | RU Start Index | RU End Index |
| Bits: | 7 | 7 |

**Figure 9-81—Partial BW Info subfield format**

**channel:** An instance of use of the wireless medium (WM) for the purpose of passing physical layer (PHY) protocol data units (PDUs) between two or more stations (STAs).

IEEE 802.11-2024; Figures 26-7, 26-8, 27-17, 9-79, 9-80, 9-81.

54. With respect to claim 1[c], the Accused Instrumentalities perform "transmitting data packets from the first wireless node to the second wireless node according to one or more transmission parameters that are at least one of received from the second wireless node or determined based on channel state information (CSI) feedback received from the second wireless node, wherein the one or more transmission parameters include at least one of transmit antenna state and a beamforming matrix to send data packets from the first wireless node to the second wireless node":

### 26.7 HE sounding operation

#### 26.7.1 General

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.

The HE beamformee returns an estimate of the channel state in an HE compressed beamforming/CQI report carried in the HE Compressed Beamforming/CQI Report field. There are three types of HE compressed beamforming/CQI report:

— SU feedback: The HE Compressed Beamforming/CQI Report field consists of an HE Compressed Beamforming Report field.

— MU feedback: The HE Compressed Beamforming/CQI Report field consists of an HE Compressed Beamforming Report field and HE MU Exclusive Beamforming Report field.

— CQI feedback: The HE Compressed Beamforming/CQI Report field consists of an HE CQI Report field.

IEEE 802.11-2024.

55. Defendants have knowingly and intentionally induced and contributed to infringement of the ’500 Patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or were willfully blind to the ’500 Patent and the infringing nature of the Accused Instrumentalities at least because of their active and ongoing historical (a) monitoring of industry standards, (b) involvement in creating, shaping and voting for industry standards including IEEE 802.11 WiFi standards, (c) leading role in certifying products as compliant with such standards, (d) on information and belief, activities including monitoring of patents relevant to such standards and such products compliant with such standards in support of both its own patent portfolio and the various indemnifications against patent infringement it offers its customers, (e) through the standard diligence process related to the Ruckus sale as the ’500 Patent is also asserted against other products in the industry implementing the same standard, and (f) through at least the filing and service of this Complaint.

56. Despite this knowledge, Defendants have continued to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the ’500 patent. Defendants have done so knowing and intending that their customers will commit these infringing acts. Defendants have also continued to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the ’500 patent, thereby specifically intending for and inducing their successors and customers to infringe the ’500 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education and instructions to customers; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

57. Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the ’500 Patent.

58. Defendants have induced, and continue to induce, infringement of the ’500 patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education and instruction to customers; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities

reasonably necessary to comply with its indemnification obligations, all within the United States.

59. QuanteFi has been damaged by Defendants' infringement of the '500 Patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 3 – INFRINGEMENT OF THE '883 PATENT

60. QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

61. On May 3, 2016, the U.S. Patent and Trademark Office issued U.S. Patent No. 9,331,883, titled "Wireless Home Network Supporting Concurrent Links to Legacy Devices." Ex. 3.

62. QuanteFi is the owner of the '883 Patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

63. The '883 Patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

64. QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '883 patent in that QuanteFi is unaware of an article subject to a duty to mark, and QuanteFi is entitled to damages for Defendants' past infringement.

65. On information and belief, Defendants make, use, import, offer for sale, and sell certain infringing products in the United States. The Accused Instrumentalities are, for example, Wi-Fi 6 and later wireless access points, and/or other wireless networking products and services that support updated Multi-User MIMO ("MU-MIMO") technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the '883 Patent.

66. The Accused Instrumentalities satisfy all claim limitations of one or more claims of the '883 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same updated MU-MIMO technology, such that facts material to infringement by one Accused Instrumentality will be material to others.

67. With respect to 1[pre], the Accused Instrumentalities include "A wireless access point (WAP) apparatus having a plurality of antennas and supporting multiple-input multiple-output (MIMO) wireless communications with associated station nodes on a selected one of a plurality of orthogonal frequency division multiplexed (OFDM) communication channels":

## 3. Definitions, acronyms, and abbreviations

### 3.1 Definitions

**access point:** (AP) An entity that contains one station (STA) and provides access to the distribution system services, via the wireless medium (WM) for associated STAs. An AP comprises a STA and a distribution system access function (DSAF).

**multiple input, multiple output (MIMO):** A physical layer (PHY) configuration in which the transmitter uses multiple antennas and the receiver might use multiple antennas.

**multi-user multiple input, multiple output:** [MU-MIMO] A technique by which multiple stations (STAs), each with one or more antennas, either simultaneously transmit to a single STA or simultaneously receive from a single STA independent PSDUs over the same subcarriers.

### 27.1.1 Introduction to the HE PHY

Clause 27 specifies the PHY entity for a high-efficiency (HE) orthogonal frequency division multiplexing (OFDM) system. In addition to the requirements in Clause 27, an HE STA shall support transmitting and receiving PPDUs that are compliant with the mandatory requirements of the following PHY specifications:

— Clause 19 and Clause 21 if the HE STA supports an operating channel width greater than or equal to 80 MHz and is operating in the 5 GHz band.
— Clause 19 and Clause 21 transmission and reception on 20 MHz channel width (see 26.17.1) if the HE STA is a 20 MHz-only non-AP HE STA and is operating in the 5 GHz band.
— Clause 19 if the HE STA is operating in the 2.4 GHz band.
— Clause 17 if the HE STA is operating in the 6 GHz band.

For 2.4 GHz band operation, the HE PHY is based on HT PHY defined in Clause 19, which in turn is based on the OFDM PHY defined in Clause 17.

For 5 GHz band operation, the HE PHY is based on the VHT PHY defined in Clause 21, which in turn is based on the HT PHY defined in Clause 19, which in turn is further based on the OFDM PHY defined in Clause 17.

For 6 GHz band operation, the HE PHY is based on the OFDM PHY defined in Clause 17.

The HE PHY extends the maximum number of users supported for DL MU-MIMO transmissions to 8 users per resource unit (RU) and provides support for DL and UL orthogonal frequency division multiple access (OFDMA) as well as for UL MU-MIMO. Both DL and UL MU-MIMO transmissions are supported on portions of the PPDU bandwidth (on resource units greater than or equal to 106 tones). In an MU-MIMO resource unit, there is support for up to 8 users with up to 4 space-time streams per user with the total across all users not exceeding 8 space-time streams.

The HE PHY provides support for 20 MHz, 40 MHz, 80 MHz, and 160 MHz contiguous channel widths and support for 80+80 MHz noncontiguous channel width, depending on the frequency band and capability. For

IEEE 802.11-2024.

68. With respect to claim 1[a], the Accused Instrumentalities include "a station grouping module configured to select a group of at least two of the associated station nodes for concurrent MIMO communication links with the WAP":

**27.3.1.1 MU transmission**

The MU transmissions include DL MU transmissions and UL MU transmissions.

DL MU transmission allows an AP to simultaneously transmit information to more than one non-AP STA. For a DL MU transmission, the AP uses the HE MU PPDU format and employs either DL OFDMA or DL MU-MIMO, or a mixture of both. UL MU transmission allows an AP to simultaneously receive information from more than one non-AP STA. UL MU transmissions are preceded by a triggering frame from the AP. The non-AP STAs transmit using the HE TB PPDU format and employ either UL OFDMA or UL MU-MIMO, or a mixture of both.

The HE PHY supports OFDMA transmissions, in both the DL and the UL where different users can occupy different RUs in a PPDU (see 27.3.10). The transmission within an RU in a PPDU may be a single stream to one user, multiple streams spatially multiplexed to one user (SU-MIMO), or multiple streams spatially multiplexed to multiple users (MU-MIMO).

NOTE—The VHT PHY supports only full-bandwidth DL MU-MIMO as described in 21.3.11.

IEEE 802.11-2024.

69. With respect to claim 1[b], the Accused Instrumentalities include “a transmit selector configured to determine whether all station nodes in the group support a multi-user (MU) protocol”:

| | | | |
|---|---|---|---|
| | | | is true. |
| HE Capabilities | As defined in HE Capabilities element | As defined in 9.4.2.247 | Specifies the parameters in the HE Capabilities element that are supported by the STA. The parameter is present if dot11HEOptionImplemented is true; otherwise, it is not present. |

A non-AP HE STA shall support the following features:

— Reception of an HE MU PPDU consisting of a single RU spanning the entire PPDU bandwidth and utilizing MU-MIMO (DL MU-MIMO). The maximum number of spatial streams per user the non-AP STA can receive in the DL MU-MIMO transmission shall be equal to the minimum of 4 and the maximum number of spatial streams supported for reception of HE SU PPDUs. The non-AP STA shall be able to receive its intended spatial streams in a DL MU-MIMO transmission with a total number of spatial streams across all users of at least 4.

IEEE 802.11-2024, p. 4135.

70. With respect to claim 1[c], the Accused Instrumentalities include “a spatial mapper including an input and an output, configured to precode concurrent transmissions to the selected

group at the input using a precode matrix 'Q' which spatially separates the concurrent MIMO transmissions to each station node in the group at the output":

### 27.3.5 Transmitter block diagram

The generation of each field in an HE PPDU uses many of the following blocks:

a) pre-FEC PHY padding
b) Scrambler
c) FEC (BCC or LDPC) encoders
d) post-FEC PHY padding
e) Stream parser
f) Segment parser (for contiguous 160 MHz and noncontiguous 80+80 MHz transmissions)
g) BCC interleaver
h) Constellation mapper
i) DCM tone mapper
j) Pilot insertion
k) Replication over multiple 20 MHz (for BW > 20 MHz)
l) Multiplication by 1st column of $P_{HE\text{-}LTF}$
m) LDPC tone mapper
n) Segment deparser
o) Space time block code (STBC) encoder for one spatial stream
p) Cyclic shift diversity (CSD) per STS insertion
q) Spatial mapper
r) Frequency mapping
s) Inverse discrete Fourier transform (IDFT)
t) Cyclic shift diversity (CSD) per chain insertion
u) Guard interval (GI) insertion
v) Windowing

### 27.3.6.11 Construction of the Data field in an HE MU PPDU

#### 27.3.6.11.1 General

In an HE MU transmission, the PPDU encoding process is performed independently in an RU on a per user basis up to the input of the spatial mapping block, except that CSD is performed with knowledge of the space-time streams starting index for that user. All user data in an RU is combined and mapped to the transmit chains in the spatial mapping block.

#### 27.3.6.11.2 Using BCC

A Data field with BCC encoding is constructed using steps a) to l) in 27.3.6.10.1 and then applying CSD for an HE MU PPDU as described in 27.3.11.2.2.




**Figure 27-19—Transmitter block diagram for DL MU-MIMO transmission of a Data field with BCC encoding on a 106- or 242-tone RU**

### 27.3.6.11.4 Combining to form an HE MU PPDU

The per user data is combined as follows:

a) Spatial mapping: The $Q$ matrix is applied as described in 27.3.12.14. The combining of all user data of an RU is done in this block.

$Q_k^{(i_{Seg})}$ is the spatial mapping matrix for the subcarrier $k$ in frequency segment $i_{Seg}$. For HE modulated fields, $Q_k^{(i_{Seg})}$ is a matrix with $N_{TX}$ rows and $N_{STS,r,total}$ columns. When beamforming or DL MU-MIMO is applied, $Q_k^{(i_{Seg})}$ is a beamforming or DL MU-MIMO steering matrix that is derived from the TXVECTOR parameter EXPANSION_MAT. The beamforming steering matrices and DL MU-MIMO steering matrices are implementation specific. If the TXVECTOR parameter BEAM_CHANGE is 1 or not present, then for pre-HE modulated fields $Q_k^{(i_{Seg})}$ is a column vector with $N_{TX}$ elements with element $i_{TX}$ being $\exp(-j2\pi k\Delta_{F,\text{ Pre-HE}}T_{CS}^{i_{TX}})$, where $T_{CS}^{i_{TX}}$ represents the cyclic shift for the transmitter chain whose values are defined in 27.3.11.2.1; otherwise it is identical to the spatial mapping $Q_k^{(i_{Seg})}$ for HE modulated fields.

$Q_{k,u}^{(i_{Seg})}$ is the spatial mapping matrix for user $u$ on subcarrier $k$ in frequency segment $i_{Seg}$. For HE modulated fields, $Q_{k,u}^{(i_{Seg})}$ is a matrix with $N_{TX}$ rows and $N_{STS,r,u}$ columns. For pre-HE modulated fields, $Q_{k,u}^{(i_{Seg})}$ is a column vector with $N_{TX}$ elements with element $i_{TX}$ being $\exp(-j2\pi k\Delta_{F,\text{ Pre-HE}}T_{CS}^{i_{TX}})$, where $T_{CS}^{i_{TX}}$ represents the cyclic shift for the transmitter chain whose values are defined in 27.3.11.2.1.

IEEE 802.11-2024; Figure 27-19; p.4207.

71. With respect to claim 1[d], the Accused Instrumentalities include "an output injector coupled to the output of the spatial mapper and configured to inject preambles for synchronizing timing of the MIMO transmissions at the output of the spatial mapper, responsive to an affirmative determination by the transmit selector":




**Figure 27-23—Timing boundaries for HE PPDU fields if midamble is not present**

### 27.3.11.10 HE-LTF field

The HE-LTF field provides a means for the receiver to estimate the MIMO channel between the set of constellation mapper outputs (or, if STBC is applied, the STBC encoder outputs) and the receive chains. In

The generation of the time domain symbol of a 1x HE-LTF is equivalent to modulating every 4 subcarriers in an OFDM symbol of 12.8 μs excluding GI and then transmitting only the first 1/4 of the OFDM symbol in the time domain, as shown in Figure 27-34.




**Figure 27-34—Generation of 1x HE-LTF symbols per frequency segment**

IEEE 802.11-2024; Figures 27-23, 27-34.

72. With respect to claim 1[e], the Accused Instrumentalities include "an input injector coupled to the input of the spatial mapper and configured to inject preambles before precoding in the spatial mapper, responsive to a negative determination by the transmit selector, whereby transmission preambles are precoded when at least one station node in the group does not support the MU protocol":




**Figure 27-13—Transmitter block diagram for L-SIG, RL-SIG, and HE-SIG-A fields for an HE SU PPDU and HE ER SU PPDU if Beam Change subfield is 1**

Figure 27-17 shows the transmitter blocks for the UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU for a single frequency segment if the number of spatial streams is less than or equal to 4. Figure 27-17 applies to the Data field of an HE MU PPDU that is transmitted on an RU allocated to a single user, the Data field of an HE SU PPDU, and the Data field of an HE TB PPDU (regardless of whether it is spatially multiplexed with other users).

The DCM tone mapper, which is part of the constellation mapper, is applied only if DCM is indicated for the RU. A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks and the blocks to the right of, and including, the spatial mapping block is also used to generate the HE-LTF fields. This is illustrated in Figure 27-32 (in 27.3.11.10). A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks and the blocks to the right of, and including, the spatial and frequency mapping block of Figure 27-17 is also used to generate the HE-STF field. This figure also applies to the Data field with BCC encoding in an HE TB PPDU.




**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**

IEEE 802.11-2024; Figures 27-13, 27-17.

73. Defendants have knowingly and intentionally induced and contributed to infringement of the '883 Patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '883 Patent and the infringing nature of the Accused Instrumentalities at least because of their active and ongoing historical (a) monitoring of industry standards, (b) involvement in creating, shaping and voting for industry standards including IEEE 802.11 WiFi standards, (c) leading role in certifying products as compliant with such standards, (d) on information and belief, activities including monitoring of patents relevant to such standards and such products compliant with such standards in support of both its own patent portfolio and the various indemnifications against patent infringement it offers its customers, (e) through the standard diligence process related to the Ruckus sale as the '883 Patent is also asserted against other products in the industry implementing the same standard, and (f) through at least the filing and service of this Complaint.

74. Despite this knowledge, Defendants have continued to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '883 Patent. Defendants have done so knowing and intending that their customers will commit these infringing acts. Defendants have also continued to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '883 Patent, thereby specifically intending for and inducing their successors and customers to infringe the '883 Patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education, and instructions to their customers; indemnifying patent infringement and conducting the internal and external

activities reasonably necessary to comply with its indemnification obligations, all within the United States.

75. Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the ’883 Patent.

76. Defendants have induced, and continue to induce, infringement of the ’883 Patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education and instructions to customers; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

77. QuanteFi has been damaged by Defendant’s infringement of the ’883 Patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

**COUNT 4 – INFRINGEMENT OF THE ’341 PATENT**

78. QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

79. On June 11, 2019, the U.S. Patent and Trademark Office issued U.S. Patent No. 10,321,341, titled “Channel Tracking in a Wireless Home Network.” Ex. 4.

80. QuanteFi is the owner of the ’341 Patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

81. The ’341 Patent describes in technical detail each limitation of the claims, allowing

a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

82. QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the ’341 patent in that QuanteFi is unaware of an article subject to a duty to mark, and QuanteFi is entitled to damages for Defendants’ past infringement.

83. On information and belief, Defendants make, use, import, offer for sale, and sell certain infringing products in the United States. The Accused Instrumentalities, such as the Ruckus products, are, for example, Wi-Fi 6 and later wireless access points, and/or other wireless networking products and services that support ChannelFly 2.0 technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the ’341 Patent.

84. The Accused Instrumentalities satisfy all claim limitations of one or more claims of the ’341 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same technology at issue, such that facts material to infringement by one Accused Instrumentality will be material to others.

85. With respect to 1[pre], the Accused Instrumentalities are “[a] wireless access point (WAP) apparatus”:



https://webresources.vistancenetworks.com/download/assets/RUCKUS+R550+Data+Sheet/0acf0f9ed7a411f091eafae0b00880c9 at p. 1.

86. With respect to 1[a], the Accused Instrumentalities include "a plurality of antenna" and "a plurality of components coupled to one another to form a plurality of multiple-input multiple-output (MIMO) transmit and receive paths, wherein each of the MIMO transmit and receive paths are coupled to a corresponding one of the plurality of antenna":

**General Specifications**

| | |
|---|---|
| Antenna Patterns, per band | 64 |
| Antenna Gain | Up to 3 dBi |
| BeamFlex | Yes |
| ChannelFly | Yes |
| Concurrent Users | 512 |
| Controller Support | RUCKUS Cloud™ \| RUCKUS SmartZone \| RUCKUS ZoneDirector \| Standalone |
| Ethernet Ports | 2 x 1 GbE |
| IoT Support | IoT Onboard |
| Number of Radios | Dual-Radio |
| PD-MRC | Yes |
| PHY Rate at 2.4 GHz, maximum | 574 Mb/s |
| PHY Rate at 5 GHz, maximum | 1200 Mb/s |
| Combined Max PHY Rate | 1774 Mb/s |
| Radio Chains and Streams | 2x2:2 |
| Rx Sensitivity at 2.4 GHz | -97 dBm |
| Rx Sensitivity at 5 GHz | -97 dBm |
| SmartMesh | Yes |
| USB | USB 2.0 |
| Venue Type | Education \| Hospitality \| Office/Retail |
| Venue Sub-Type | Classroom \| Hallways \| Office Space |
| Wi-Fi Bands Supported | 2.4 GHz \| 5 GHz |
| Wi-Fi Generation | Wi-Fi 6 |
| Wi-Fi Interface Standard | IEEE 802.11a/b/g/n/ac/ax |

https://www.ruckusnetworks.com/products/wireless-access-points/r550/;

| WI-FI | |
|---|---|
| Wi-Fi Standards | • IEEE 802.11a/b/g/n/ac/ax |
| Supported Rates | • 802.11ax: 4 to 1774 Mbps<br>• 802.11ac: 6.5 to 867Mbps (MCS0 to MCS9, NSS = 1 to 2 for VHT20/40/80)<br>• 802.11n: 6.5 Mbps to 300Mbps (MCS0 to MCS15)<br>• 802.11a/g: 6 to 54 Mbps<br>• 802.11b: 1 to 11 Mbps |
| Supported Channels | • 2.4GHz: 1-13<br>• 5GHz: 36-64, 100-144, 149-165 |
| MIMO | • 2x2 SU-MIMO<br>• 2x2 MU-MIMO |
| Spatial Streams | • 2 streams SU/MU MIMO 5GHz<br>• 2 streams SU/MU MIMO 2.4GHz |
| Radio Chains and Streams | • 2x2:2 (5GHz)<br>• 2x2:2 (2.4GHz) |
| Channelization | • 20, 40, 80MHz |
| Security | • WPA-PSK, WPA-TKIP, WPA2 AES, WPA3-Personal, WPA3-Enterprise, 802.11i, Dynamic PSK, OWE<br>• WIPS/WIDS |
| Other Wi-Fi Features | • WMM, Power Save, Tx Beamforming, LDPC, STBC, 802.11r/k/v<br>• Hotspot<br>• Hotspot 2.0<br>• Captive Portal<br>• WISPr |

https://webresources.vistancenetworks.com/download/assets/RUCKUS+R550+Data+Sheet/0acf0f9ed7a411f091eafae0b00880c9 at p. 4.

87. With respect to 1[b], the Accused Instrumentalities include “wherein the WAP is configured to support wireless communications with a plurality of station nodes on a selected one of a plurality of communication channels of an associated wireless local area network (WLAN), including: a first set of receive path components supporting at least two MIMO receive paths dedicated exclusively for MIMO reception of WLAN communications on the selected one of the plurality of communication channels; a second set of receive path components supporting a single MIMO receive path and configured to switch the single MIMO receive path between MIMO reception of WLAN communications on the selected one of the plurality of communication

channels concurrently with the at least two MIMO receive paths of the first set of receive path components, and monitoring of communications on remaining ones of the plurality of communication channels":

| | |
|---|---|
| MIMO | • 2x2 SU-MIMO<br>• 2x2 MU-MIMO |
| Spatial Streams | • 2 streams SU/MU MIMO 5GHz<br>• 2 streams SU/MU MIMO 2.4GHz |

| PERFORMANCE AND CAPACITY | |
|---|---|
| Peak PHY Rates | • 2.4GHz: 574 Mbps<br>• 5GHz: 1200 Mbps |
| Client Capacity | • Up to 512 clients per AP |
| SSID | • Up to 31 per AP |

The R550 Wi-Fi 6 AP incorporates patented technologies found only in the RUCKUS Wi-Fi portfolio.

- **BeamFlex® + Antennas:** Extended coverage and optimized throughput with patented multi-directional antennas and radio patterns
- **ChannelFly®:** Improved throughput with dynamically changing the channels to use least congested channel

https://webresources.vistancenetworks.com/download/assets/RUCKUS+R550+Data+Sheet/0acf0f9ed7a411f091eafae0b00880c9 at pp. 1, 4.

## What is background scanning?

The Background Scanning algorithm uses an industry-standard approach of placing neighboring APs on different channels by prioritizing channels with the fewest number of neighbors. However, it doesn't consider the airtime utilization or estimated capacity of the channels. It is also sensitive to interference and can change channels often during business hours, which may not be ideal for many customers as channel changes may cause disruption to some clients.

## What is ChannelFly Software?

The legacy ChannelFly algorithm was designed to optimize for capacity, choosing channels with more capacity instead of non-overlapping channels. Unlike Background Scanning, it wasn't designed to optimize for placing neighboring APs on different channels as it optimizes on a per-AP basis. Because the algorithm requires estimated channel capacity, it needs client traffic to make good decisions. This may not be ideal for environments like stadiums and hotel conference rooms where you can go days without client traffic. In 2020, the RUCKUS® engineering team delivered ChannelFly 2.0 focused on placing neighboring APs on different channels. It uses a background scan interval similar to the Background Scanning algorithm to collect data. Instead of solely comparing the estimated capacity of channels, this new version considers RX (Receive, also referred to as "Rx") airtime utilization as a metric to determine if a channel is busy.

In addition, RUCKUS introduced a new AI-driven algorithm as a technology that not only optimizes channel planning but also adjusts channel bandwidth and AP transmit power selection to maximize the network throughput.

https://www.ruckusnetworks.com/blog/2023/channelfly-2.0.

88. With respect to 1[c], the Accused Instrumentalities include "a channel tracker coupled to the plurality of components":

## How does ChannelFly Technology work?

In phase 1 of the new ChannelFly algorithm, each AP collects the RX utilization of neighboring APs (both friendly and unknown APs) during the default 20-second background scan interval. The neighboring APs are weight-adjusted based on the RSSI (a nearby AP should have a higher weight than a faraway AP on the same channel). It maintains a database of an average of 16 entries at any time, which is used in phase 2.

In phase 2, each AP selects channels with the least number of neighbors. The average RX airtime utilization of each selected channel from phase 1 is now considered, doing a cost-benefit analysis between the best channels with the least RX utilization and choosing a candidate channel.

https://www.ruckusnetworks.com/blog/2023/channelfly-2.0.

89. With respect to 1[d], the Accused Instrumentalities include "wherein the WAP is further configured to: determine, via the channel tracker, a target channel for a prospective channel changeover among the remaining monitored ones of the plurality of communication channels while simultaneously monitoring communications on the remaining ones of the plurality of communication channels; and intermittently switch the single MIMO receive path without disruption of the WLAN communications between: monitoring the remaining ones of the plurality of communication channels, and receiving MIMO communications on the selected one of the plurality of communication channels":

## What is background scanning?

The Background Scanning algorithm uses an industry-standard approach of placing neighboring APs on different channels by prioritizing channels with the fewest number of neighbors. However, it doesn't consider the airtime utilization or estimated capacity of the channels. It is also sensitive to interference and can change channels often during business hours, which may not be ideal for many customers as channel changes may cause disruption to some clients.

## What is ChannelFly Software?

The legacy ChannelFly algorithm was designed to optimize for capacity, choosing channels with more capacity instead of non-overlapping channels. Unlike Background Scanning, it wasn't designed to optimize for placing neighboring APs on different channels as it optimizes on a per-AP basis. Because the algorithm requires estimated channel capacity, it needs client traffic to make good decisions. This may not be ideal for environments like stadiums and hotel conference rooms where you can go days without client traffic. In 2020, the RUCKUS® engineering team delivered ChannelFly 2.0 focused on placing neighboring APs on different channels. It uses a background scan interval similar to the Background Scanning algorithm to collect data. Instead of solely comparing the estimated capacity of channels, this new version considers RX (Receive, also referred to as "Rx") airtime utilization as a metric to determine if a channel is busy.

In addition, RUCKUS introduced a new AI-driven algorithm as a technology that not only optimizes channel planning but also adjusts channel bandwidth and AP transmit power selection to maximize the network throughput.

# How does ChannelFly Technology work?

In phase 1 of the new ChannelFly algorithm, each AP collects the RX utilization of neighboring APs (both friendly and unknown APs) during the default 20-second background scan interval. The neighboring APs are weight-adjusted based on the RSSI (a nearby AP should have a higher weight than a faraway AP on the same channel). It maintains a database of an average of 16 entries at any time, which is used in phase 2.

In phase 2, each AP selects channels with the least number of neighbors. The average RX airtime utilization of each selected channel from phase 1 is now considered, doing a cost-benefit analysis between the best channels with the least RX utilization and choosing a candidate channel.

https://www.ruckusnetworks.com/blog/2023/channelfly-2.0.

90. Defendants have knowingly and intentionally induced and contributed to infringement of the '341 Patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '341 Patent and the infringing nature of the Accused Instrumentalities at least because of their active and ongoing historical (a) monitoring of industry standards, (b) involvement in creating, shaping and voting for industry standards including IEEE 802.11 WiFi standards, (c) leading role in certifying products as compliant with such standards, (d) on information and belief, activities including monitoring of patents relevant to such standards and such products compliant with such standards in support of both its own patent portfolio and the various indemnifications against patent infringement it offers its

customers, and (e) through at least the filing and service of this Complaint. Moreover, given Ruckus's long leadership in WiFi industry groups and the participation in defining and voting on the various WiFi technical standards issued by the IEEE, on information and belief, Defendants were aware of at least the early leading patents in the portfolios of its leading early collaborators, such as Quantenna (original owner of the patent family including the '341 patent), Lantiq and Cisco..

91. Despite this knowledge, Defendants have continued to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '341 Patent. Defendants have done so knowing and intending that their customers will commit these infringing acts. Defendants have also continued to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '341 Patent, thereby specifically intending for and inducing their successors and customers to infringe the '341 Patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education, and instructions to their customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

92. Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '341 Patent.

93. Defendants have induced, and continue to induce, infringement of the ’341 Patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information such as technical information on how to make or configure the Accused Instrumentalities; providing information, education and instructions to customers; providing the Accused Instrumentalities to customers; indemnifying patent infringement and conducting the internal and external activities reasonably necessary to comply with its indemnification obligations, all within the United States.

94. QuanteFi has been damaged by Defendant’s infringement of the ’341 Patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## JURY DEMAND

95. QuanteFi demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## RELIEF REQUESTED

QuanteFi prays for the following relief:

A. A judgment in favor of QuanteFi that Defendants have infringed the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B. A judgment and order requiring Defendants to pay QuanteFi past and future damages arising out of Defendants’ infringement of the Asserted Patents in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest for its infringement of the asserted patents, as provided under 35 U.S.C. § 284;

C. A permanent injunction prohibiting Defendants from further acts of infringement of the Asserted Patents;

D. A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to QuanteFi, including, without limitation, pre-judgment and post-judgment interest;

E. A judgment that Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

F. A finding that this case is exceptional under 35 U.S.C. § 285, and an award of QuanteFi's reasonable attorney's fees and costs; and

G. Any and all other relief to which QuanteFi may be entitled.

Dated: August 21, 2026

Respectfully submitted,

*/s/ Marc Fenster*

Marc Fenster
CA State Bar No. 181067
Email: mfenster@raklaw.com
Reza Mirzaie
CA State Bar No. 246953
Email: rmirzaie@raklaw.com
Paul Kroeger
CA State Bar No. 229074
Email: pkroeger@raklaw.com
Adam Hoffman
CA SBN 218740
Email: ahoffman@raklaw.com
Andrew Weiss
CA SBN 232974
Email: aweiss@raklaw.com
Neil A. Rubin
CA SBN 250761
Email: nrubin@raklaw.com
Christian W. Conkle
CA SBN 306374
Email: cconkle@raklaw.com

Jonathan Ma
CA SBN 312773
Email: jma@raklaw.com
Alexandra F. Easely
TX SBN 24099022
Email: aeasely@raklaw.com
Linjun Xu
CA SBN 307667
Email: lxu@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF,**
**QuanteFi Research LLC**